**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JENNIFER INSKIP and<br>AMBER ARANDA,<br>*individually and on behalf of*<br>*themselves and others similarly situated,*<br><br>                    Plaintiffs,<br>v.<br>GOOD TASTE, INC.,<br>GOOD TASTE TWO, INC.,<br>GOOD TASTE THREE, INC.,<br>COZY CORNER DINER & PANCAKE<br>HOUSE INC., Ill. Corporations<br>IRENE IATRIDES,<br>PETER IATRIDES,<br>And MICHAEL KIDONAKIS, individually,<br><br>                    Defendants. | Case No.:  1:22-cv-02862<br>Honorable Andrea R. Wood<br><br>Magistrate Judge Heather McShain |

**PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT, ATTORNEYS' FEES, COSTS,
<u>AND INCENTIVE AWARDS</u>**

## I.    <u>INTRODUCTION</u>

Plaintiffs seek final approval of a $505,000.00 Class Settlement that resolves claims brought under the Fair Labor Standard Act (FLSA), Illinois Minimum Wage Law (IMWL), Illinois Wage Payment Collection Act (IWPCA), and Chicago Minimum Wage Ordinance (CMWO) on behalf of approximately 185 current and former employees of three defendant entities. Not a single person objected to the Settlement, and only one has submitted an election to opt out of it. (See Declaration of Mary Butler attached as Exhibit 1, ¶¶ 11-13).

Plaintiff's lawsuit alleges allegations that Defendants did not properly pay employees overtime wages, failed to pay full minimum wage for time spent working non-tip producing work

1

or other "side work", failed to maintain a proper tip-pool, failed to properly utilize the tip credit wage, and made unauthorized deductions from wages for items including uniforms.

Defendants deny any liability. Rather than fighting over these issues for many years during prolonged litigation, the Parties reached a resolution after substantial discovery and vigorous negotiations with the assistance of Magistrate Judge McShain. The Parties executed the Settlement and Release Agreement ("Settlement Agreement") and preliminary approval of the collective and class settlement was approved on December 26, 2024.

For the reasons stated below, Plaintiffs request that the Court grant final approval of the Class and Collective Certification and approve the Parties' Settlement Agreement attached as Exhibit 2 and enter the proposed order attached as Exhibit 3.

## II.    LEGAL BACKGROUND AND PROCEDURAL HISTORY

As described in greater detail in the Amended Complaint and Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action And Collective Action Settlement and for Certification of Claims Pursuant to Fed.R.Civ.P.23 and 29 U.S.C. §216(b) For Settlement Purposes Only ("Preliminary Approval Motion"), Plaintiffs' overtime wage claims are based on allegations including that Defendants did not properly pay Plaintiffs and similarly situated employees overtime and minimum wages, failed to maintain a proper tip pool, failed to properly utilize the tip credit wage, and made unauthorized deduction from wages.

While Plaintiffs were confident in the claims, there was uncertainty because an adverse ruling on these or other issues could result in Plaintiffs and the settlement class receiving no damages whatsoever. *See* 29 U.S.C. § 207(e)(1). Moreover, Defendants would likely argue that they acted in good faith pursuant to 29 U.S.C. § 259. Defendants also had numerous additional defenses that they would have raised.

2

Negotiations began in June 2023 and continued through a settlement conference with Magistrate Judge McShain on January 23, 2024. During discovery and these negotiations, the Parties exchanged payroll records to ascertain class and collective size and damages. All damage calculations were derived from Defendants' payroll data—except for Good Taste, Inc., which was voluntarily dismissed from this action as part of the settlement negotiations. The parties also continued to negotiate various points following the settlement conference. Through further negotiations the parties reached a proposed class and collective settlement. On December 26, 2024, this Court granted preliminary approval of the Parties' Settlement Agreement, preliminarily certified the Rule 23 Class and conditionally certified the FLSA Collective.

The Notice process in this case was effective, as explained below, 93% of notices were successfully delivered. Ex. 1, ¶_. Only one member of the settlement class has opted out of the settlement and 61 have sent opt-in forms to opt-in to the FLSA collective. Ex. 1, ¶11-12. As such, nearly 33% of potential FLSA collective members have joined the FLSA collective settlement.

## III.    SUMMARY OF SETTLEMENT TERMS.

### A. Settlement Awards, IMWL Class and FLSA Collective.

The settlement gives IMWL Class Members and FLSA Collective Members gross settlement awards, before accounting for attorney fees and costs, claims administration fees, and service award, that represents approximately 98.15% of all back wages, and equal amount of back wages for liquidated damages available under the FLSA, another equal amount of back wages for IMWL and CMWO's treble damage provision, and 5% monthly penalty under the IMWL. Additionally, a gross amount of $25 was allocated to each class member for the wage deduction claim. Because the FLSA allows an amount equal to unpaid wages as liquidated damages and the IMWL mandates treble damages (as does and CMWO) and a 5% monthly penalty, Class and

3

Collective Members are receiving approximately 422% of unpaid wages, before accounting for attorneys' fees, costs, service awards, and administrator fees. Class and Collective Members are estimated to receive approximately 60.81% of their settlement awards after accounting for the proposed attorney fees and costs, settlement administration costs and service awards.

Additionally, this is not a claims-made settlement for the Rule 23 Class Members did not need to submit a claim form to receive their Settlement Award payment. Moreover, the Settlement Agreement also provides for a reallocation of funds attributed to current employees who do not participate in the settlement or otherwise cash their settlement awards. As such, those current employees that participate in the settlement and cash their settlement awards will likely receive even more in settlement awards.

### B. Additional Terms.

Within 21 days of the Settlement Effective Date (when the final approval order becomes unappealable), the Settlement Administrator shall issue settlement award checks. Collective and Class members shall have 120 days after mailing to cash their checks.

Pursuant to the Settlement Agreement, the portion of the settlement awards attributable to wages shall be treated as W-2 wages and have applicable payroll taxes and withholdings applied. Non-wage portions of the awards and portions treated as statutory or liquidated damages under the FLSA, IMWL, IWPCA, and CMWO shall be treated as non-wage 1099 income and will not have payroll taxes or withholdings applied.

Under the Agreement, there is a limited reversion up to $60,000.00 of unclaimed and uncashed funds related to former employees, any of these unclaimed or uncashed funds in excess of $60,000.00 shall be donated evenly as a charitable donation to Holy Taxiarhai and Saint Haralambos Greek Orthodox Church, Niles, Illinois and St. Nectarios Greek Orthodox Church,

Palatine, Illinois.

Additionally, under the Agreement up to $10,000 in payroll taxes will be paid from the QSF with any remaining payroll tax being paid by Defendants—as of this date the calculated payroll tax is only $7,168.95.

**C.     Notice Obligations were fulfilled.**

Pursuant to the Preliminary Approval Order, the parties carried out their obligations. The Settlement Administrator mailed to each Class Member the appropriate notice via first class U.S. mail. Ex. 1, ¶9.  Additionally, the Administrator updated addresses after consulting the National Change of Address Databases and notice was also delivered via text. Ex. 1, ¶8-9. Thirty-eight notices were initially returned as undeliverable and the Administrator skip traced using Accurint, a Lexis-Nexis research tool, to find current addresses and remailed 25 notices. Ex. 1, ¶ 10. Ultimately, after additional searches 13 notices were undeliverable, as no additional addresses were found. Ex. 1, ¶10. The Administrator also set up a toll-free number for Class Members to call and make inquiries that was accessible 24 hours a day, 7 days a week. Ex. 1, ¶5.

**D. DEFENDANTS PROVIDED NOTICE PURSUANT TO THE CLASS ACTION FAIRNESS ACT AND THERE ARE NO OBJECTORS.**

Although it is likely that the Class Action Fairness Act does not apply as the matter in controversy does not exceed $5,000,000.00 and arguably all class members reside in Illinois (*Juvera v. Salcido*, No. CV-11-2119-PHX-LOA, 2013 WL 6628039, n3 (D. Ariz. Dec. 17, 2013)), out of caution, Defendants served notice as set forth in the Class Action Fairness Act, 29 U.S.C. §1715.  At the time of filing this brief, more than 80 days have passed since serving notices. See Exhibit 4, Declaration of Stephanie M. Dinkel. By the time of the fairness hearing, 90 days will have passed since serving the notices and should any objections be received in the meantime,

5

counsel will advise the Court. At this time, no state or Federal official has contacted the parties regarding any objections and/or the Agreement. *Id*. The parties are not aware of any state or Federal official objecting to this Agreement. *Id*. Therefore, in addition to the fact that the amount in controversy does not meet the threshold of $5M, to the extent necessary, Defendants' notices satisfy the requirements, and 28 U.S.C. §1715(e) is not applicable to the parties' Agreement nor this matter.

## IV.  THE COURT SHOULD GRANT FINAL APPROVAL.

### A.  Class Action Settlement Approval Process

Approval of class action settlements is typically a three-step process:

(1) preliminary approval of the settlement at an informal hearing;

(2) dissemination of mailed and/or published notice of the settlement to all affected class members; and

(3) a "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy and reasonableness of the settlement may be presented.

*Manual for Complex Lit.*, at § 21.632–34.

This procedure, used by courts in this Circuit and endorsed by the leading class action treatise, safeguards the due process rights of absent class members and enables the district court to fulfill its role as the guardian of class interests. *See* 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, at § 11.22, *et seq.* At the formal fairness hearing, Class Members may be heard and further evidence and argument concerning the fairness, adequacy, and reasonableness of the Settlement may be presented. With this motion, the Parties request that the Court take the last step in the settlement approval process by granting final approval of the Settlement.

**B.     The Parties Have Satisfied the Requirements of Rule 23 and the Court's Notice Procedures Set Forth in the Preliminary Approval Order.**

As to the distribution of notice, in the Preliminary Approval Order, the Court ordered that notice be effectuated as called for in the Agreement, specifically by first-class mail and text. Rule 23(c)(2)(B) requires the Court to direct the "best notice practicable" under the circumstances, including "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). As the Supreme Court has held, notice by mail provides such "individual notice to all members" in accordance with Rule 23(c)(2). *Id.* Where the names and addresses of class members are easily ascertainable, individual notice through the mail is "clearly the 'best notice practicable.'" *Id.* at 175.

The Claims Administrator, in fact, mailed to each Class Member the appropriate Notice via first class U.S. mail to each Member's last-known physical address, as reflected in Defendants' records and verified and updated those records utilizing the National Change of Address Database and advanced address database searches. See Ex.1, ¶¶6-9. No Class Member has opted out, and nobody has objected. Id. ¶¶ 11-13. Additionally, the Administrator set up a 24-hour, 7 day a week toll free number and website. *Id.* ¶ 4. The Parties' efforts to effectuate notice to the Class meets the requirements of Rule 23(c)(2)(B).

**C.     Final Approval is Appropriate Pursuant to Rule 23(E) Because the Settlement is Fair, Adequate, and Reasonable**

Ultimately, "the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002) (internal citation omitted). Utilizing a five-factor test, a court must consider: (1) the strength of plaintiffs' case compared with the terms of the proposed settlement; (2) the

likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006); *Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996). Further, a court must not focus on an individual component of the compromise but must instead view the settlement in its entirety. *Isby,* 75 F.3d at 1199. Finally, a strong presumption of fairness exists when the settlement is the result of extensive arm's-length negotiations. *Hispanics United of DuPage County v. Village of Addison, Ill.,* 988 F. Supp. 1130, 1149 n.6 (N.D. Ill. 1997); *Great Neck Capital Appreciation Inv. P'Ship, L.P. v. Pricewaterhouse Coopers*, 212 F.R.D. 400, 410 (E.D. Wis. 2002). For the following reasons, the class action settlement is fair, adequate, and reasonable, and not a product of collusion and therefore should be finally approved.

### 1. Strength of Plaintiffs' Case as Compared to the Amount of the Settlement and Allocation of the Settlement Payment.

A key consideration in evaluating a proposed settlement is the strength of the plaintiffs' case as compared to the amount of the defendants' offer. *See Isby*, 75 F.3d at 1199. However, "district courts have been admonished 'to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights.'" *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). A settlement is fair "if it gives [plaintiffs] the expected value of their claim if it went to trial, net of the costs of trial." *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 682 (7th Cir. 1987) (finding adequate a settlement of ten percent of the total sought due to risks and costs of trial); *Hiram Walker,* 768 F.2d at 891 (settlement approved because "there [was] no showing that the amounts received by the beneficiaries were totally inadequate").

8

Plaintiffs believe that this case is an excellent result for the Class Members and opt-in Plaintiffs because they are as a whole, (before accounting for attorney fees and costs, etc.), getting approximately 98.15% of alleged unpaid wages including applicable FLSA and IMWL/CMWO statutory damages and many will receive *more* than this amount after reallocations of unclaimed and uncashed funds for current employees. Additionally, each class member is allocated a gross amount of $25.00 for alleged unauthorized wage deductions.

Settlement eliminates the risk that Collective and Class members could recover a lower amount or nothing at all. While Plaintiffs felt confident in the claims, there remains the prospect that they might not prevail (or, if they prevail, the recovery might be limited to only a lesser amount of damages than was hoped). Moreover, Defendants could have asserted defenses that may have eliminated or lessened the claims. In particular, Plaintiffs also faced the risk of not being able to certify a class or having a collective decertified as certain issues arose, *i.e.* whether employees are similarly situated, along with the plethora of other defenses that competent defense lawyers (such as those in this case) frequently raise. There was also a risk of Defendants being unable to pay a substantial judgement. Settlement alleviates these risks.

### 2. Complexity, Length, and Expense of Further Litigation

A second factor to be considered by the Court is the complexity, length, and expense of litigation that will be spared by the proposed settlement. *In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000). Absent settlement, Defendants would continue to vigorously defend the case. Significant attorneys' fees and costs would be expended by all Parties in investigating the claims further and litigating over class and collective certification. Further litigation would potentially result in dispositive motions, and the possibility of appeals. Additional litigation would increase expenses and would not reduce the risks of litigation to the Settlement

9

Class. *See Isby*, 75 F.3d at 1199; *see also In re Mexico Money Transfer Litig*., 164 F. Supp. 2d at 1019; *see also Great Neck Capital,* 212 F.R.D. at 409-10. Accordingly, the remaining burden, expenses, and risks for the Collective and Class Members would be substantial as continued litigation would require resolution of complex issues at considerable expense. "Courts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Beckman v. KeyBank, N.A.,* 293 F.R.D. 467, 474–75 (S.D.N.Y. 2013). This is especially pertinent from Plaintiffs' view, as this Settlement would put money in the hands of working-class service workers.

### 3. There is No Opposition to the Settlement

Plaintiffs support the settlement, as do Class Counsel, and Defendants. Moreover, Class Counsel is not aware of any opposition to the settlement. Class Counsel has not spoken to any Collective or Class Member opposed to settling their claims and receiving payments. The lack of opposition to a class action settlement "indicates that the Collective and Class Members consider the settlement to be in their best interest." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *6. The Court-approved Claims Administrator diligently implemented the Notice Plan, and the objection and exclusion deadlines have passed without a single person objecting to the Settlement. That no one objected to the Settlement is powerful evidence of the Class's support for the Settlement. *See McDaniel v. Qwest Commc'ns Corp.*, No. CV 05 C 1008, 2011 WL 13257336, at *4 (N.D. Ill. Aug. 29, 2011) (finally approving settlement with no objections and noting that "[a]n absence of objection is a 'rare phenomenon[]' and 'indicates the appropriateness of the request[]'") (citations omitted); *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (stating that "[t]he absence of objection to a

proposed class settlement is evidence that the settlement is fair, reasonable and adequate"). Additionally, only one Class Member opted-out of the settlement. This factor thus strongly supports granting final approval to the Settlement.

### 4. Opinion of Counsel

Class Counsel is experienced in class action litigation and had a substantial amount of information to evaluate, negotiate and make well-informed judgments about the adequacy of the Settlement. In Class Counsel's opinion, the Settlement is fair, reasonable and adequate. *See* Declaration of John Kunze attached as Exhibit 5. It is appropriate for the Court to place significant weight on the endorsement of this Settlement by Class Counsel. Class Counsel exercised their experience based on an intimate knowledge of the facts of the case and the legal issues facing the Class, including conducting an independent analysis of the strengths and weaknesses of the claims and value of the claims and the time costs, as well as the expense of trials and appeals. When experienced counsel supports the settlement, as they do here, their opinions are entitled to considerable weight. *See In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d at 1020; *Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983). "[J]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148-49 (8th Cir.1999) (citation omitted); *Grove v. Principal Mutual Life Ins. Co.*, 200 F.R.D. 434, 445 (S.D. Iowa 2001).

Workplace Law Partners P.C. (formerly Fish Potter Bolaños, P.C.) has been Class Counsel for numerous FLSA and IMWL class wage settlements and other types of class actions. *See* Exhibit 6. Courts in this District have found this law firm are qualified class counsel. *See Pietrzycki v. Heights Tower Serv., Inc.*, 197 F. Supp. 3d 1007, 1019 (N.D. Ill. 2016) (appointing David Fish class counsel after noting his "litigation experience in labor/employment cases as well as class

actions[,]" as well as his and his firm's diligence). Furthermore, Workplace Law Partners P.C. has and is serving as counsel in many completed and pending wage class action cases and therefore has extensive experience in these fields. Put simply, and for the reasons discussed in detail above, Class Counsel believe that the Settlement provides outstanding monetary and prospective relief without the uncertainty and delay those years of litigation would bring. That is certainly in the best interests of the Settlement Class.

### 5. The Settlement Was the Result of Arm's Length Negotiations Without Any Hint of Collusion

The Settlement was the result of adversarial, arm's length negotiations with extensive discovery and the assistance of Magistrate Judge McShain. This involved a deposition on jurisdictional issues, substantial document production, and substantial negotiations regarding potential damages from payroll data produced by Defendants. In determining whether a settlement was reached absent any collusion between the parties, courts look to whether the settlement negotiation is "intense, vigorous, and at arm's length." *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d at 1020. Such arm's-length negotiations conducted by competent counsel constitute *prima facie* evidence of a fair settlement. *Berenson v. Fanueil Hall Marketplace*, 671 F. Supp. 819, 822 (D. Mass. 1987) ("where . . . a proposed class settlement has been reached after meaningful discovery, after arm's-length negotiation by capable counsel, it is presumptively fair."). In the absence of any evidence of collusion, this factor favors final approval of the settlement. *See Winston v. Speybroeck*, No. 3:94-CV-150AS, 1996 U.S. Dist. LEXIS 12131, at *15-16 (N.D. Ind. Aug. 2, 1996). The Court should therefore find that the Settlement meets the requirements of and was the result of arm's-length bargaining.

## V. THE COURT SHOULD APPROVE THE ATTORNEY FEES AND COSTS, SERVICE AWARDS, AND CLAIMS ADMINISTRATOR FEES.

### A. The Court Should Approve One-Third of Gross Settlement Fund As Attorney Fees

#### 1. Class Counsel Negotiated a Settlement Structure that Favors FLSA Collective and Rule 23 Class Members

To begin, the Gross Settlement Fund of $505,000.00 represents a gross recovery of 98% of alleged unpaid wages, liquidated, and statutory damages under the FLSA and IMWL/CMWO and gross amounts of $25 per class member for alleged wage deductions, before accounting for attorney fees, costs, settlement administrator fees and service awards. This is an excellent result for Settlement Class Members. Additionally, because of the reallocation of current employee uncashed settlement checks, many will receive more than this amount.

#### 2. The Court Should Award Attorney's Fees as a Percentage of the Fund

The Court should award attorney's fees as a percentage of the settlement fund made available to the FLSA Collective and Class Members. When counsel's efforts result in the creation of a common fund, counsel is "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548 (7th Cir. 2003) (creation of common fund "entitles [counsel] to a share of that benefit as a fee"). This is "based on the equitable notion that those who have benefited from litigation should share in its costs*." Sutton v. Bernard,* 504 F.3d 688, 691-92 (7th Cir. 2007) (quoting *Skelton v. G.M. Corp.,* 860 F.2d 250, 252 (7th Cir. 1988)); *Kaplan v. Houlihan Smith & Co*., No. 12 Civ. 5134, 2014 WL 2808801, at *3 (N.D. Ill. June 20, 2014); *see also Boeing,* 444 U.S. at 478.

Although there are two ways to compensate attorneys for successful prosecution of statutory claims – the lodestar method and the percentage of the fund method, *see Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 565-66 (7th Cir. 1994) – the favored approach in the

Seventh Circuit is to use the percentage of the fund method in common fund cases like this one. "Our court of appeals favors the percentage-of-the-fund fee in common fund cases because it provides the best hope of estimating what a willing seller and a willing buyer seeking the largest recovery in the shortest time would have agreed to ex ante." *In re FedEx Ground Package System, Inc. Employment Practices Litig.,* 251 F. Supp. 3d 1225, 1236 (N.D. Ind. 2017) (citing *In re Synthoid Mktg. Litig.,* 325 F.3d 974, 979-80 (7th Cir. 2003)); *see also McDaniel v. Qwest Commc'ns Corp.*, No. 05 C 1008, 2011 WL 13257336, at *3 (N.D. Ill. Aug. 29, 2011) ("Many courts have found the percentage-of-recovery method provides a good emulation of the real-world market value of attorneys' services provided on a contingent basis."). It is especially appropriate to use a common fund approach in cases based on fee shifting statutes when the "settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees . . . ." *Skelton,* 860 F.2d at 256; accord *Florin,* 34 F.3d at 564. Here, the Settlement releases Collective and Class Members' statutory claims to fees. There are several other reasons that courts in the Seventh Circuit favor the percentage of the fund method. First, the percentage of the fund method promotes early resolution and removes the incentive for plaintiffs' lawyers to engage in wasteful churning of the file to increase their billable hours. *See In re Synthroid Mktg. Litig.,* 264 F.3d 712, 789-90 (7th Cir. 2001). Where attorneys' fees are limited to a percentage of the total, "courts can expect attorneys to make cost efficient decisions about whether certain expenses are worth the win." *Gaskill v. Gordon,* 942 F. Supp. 382, 386 (N.D. Ill. 1996), aff'd, 160 F.3d 361 (7th Cir. 1998); *see also In re Amino Acid Lysine Antitrust Litig*., No. 95 Civ. 7679, 1996 WL 197671, at *2 (N.D. Ill. Apr. 22, 1996) (explaining "growing recognition that in a common fund situation . . . a fee based on a percentage of recovery . . . tends to strike the best balance in favor of the clients' interests while at the same time preserving the lawyers' self-interest").

14

Courts in the Northern District of Illinois routinely approve one-third of the settlement fund as attorneys' fees in FLSA collective actions settlements. *See, e.g., Castillo v. Noodles & Co.*, 2016 WL 7451626 (N.D. Ill. Dec. 23, 2016), at \*3-4 (awarding one-third of a $3,000,000 settlement fund in FLSA overtime action); *Furman v. At Home Stores LLC*, No. 2017 WL 1730995, at 3-4 (N.D. Ill. May 1, 2017) (awarding one-third of $990,000 settlement fund in FLSA overtime action); *Briggs v. PNC Financial Services Group, Inc.*, 2016 WL 7018566, at \*1 (N.D. Ill. Nov. 29, 2016) (awarding one-third of $2,000,000 settlement fund in FLSA overtime action); *Day v. NuCO2 Mgmt., LLC*, 1:18-CV-02088, 2018 WL 2473472, at \*1 (N.D. Ill. May 18, 2018) (awarding one-third of $900,000 settlement fund in case that was settled before filing suit); *Koszyk*, 2016 WL 5109196, at \*3-4 (awarding one-third of $2,825,000 settlement fund in FLSA overtime case). Consistent with the Seventh Circuit's admonition to award attorneys' fees that approximate the market rate, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), these courts explain that one-third of the settlement fund is consistent with market rates in the Northern District of Illinois charged by experienced plaintiffs' counsel in contingent-fee wage and hour class and collective actions.

Second, the percentage method preserves judicial resources because it saves the Court from the cumbersome task of reviewing complicated and lengthy billing documents. *Florin,* 34 F.3d at 566 (noting "advantages" of percentage of the fund method's "relative simplicity of administration"); *Gaskill*, 942 F. Supp. at 386 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (fee requests "should not result in a second major litigation")). Courts in this district routinely apply the percentage method to common fund settlements and have noted the advantages of this approach. *See, e.g., In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1040 (N.D. Ill. 2011) (using percentage method because it did "not need to resort to a

15

lodestar calculation, which would be costly to conduct, to reinforce the same conclusion"); *Gaskill*, 942 F. Supp. at 386 (describing advantages of percentage method, including judicial efficiency and an "efficient check on the attorney's judgment" in economic decision-making). As the Second Circuit has explained, the "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 48-49 (2d Cir. 2000) (citation omitted)

### 3. The Market for Legal Services Supports Plaintiffs' Request.

In deciding the fee to award in common fund cases, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton,* 504 F.3d at 692-94, citing *In re Synthroid Mktg. Litig.,* 264 F.3d at 718 (collecting cases)). The Seventh Circuit has held that "[a]lthough it is impossible to know ex post exactly what terms would have resulted from arm's-length bargaining ex ante, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. Aon Corp.,* 415 F.3d 597, 599 (7th Cir. 2005). The percentage method is consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *Kirchoff v. Flynn,* 786 F.2d 320, 324 (7th Cir. 1986) ("[w]hen the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'") (emphasis in original). In the marketplace, the "contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Kirchoff,* 786 F.2d at 325; see also *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent*

*Actions*, 148 F.3d 283, 333 (3d Cir. 1998).

Here, prior to filing the Complaint, Class Counsel executed a fee agreement with the Class Representative that entitled Class Counsel to attorney's fees equal to 40% of any recovery but Class Counsel has elected to only seek one-third. Because the Parties negotiated an attorneys' fees arrangement at the start of the litigation, the presumption of market-rate reasonableness applies. See *Briggs v. PNC Financial Services Group, Inc.,* No. 1:15-cv-10447, 2016 WL 7018566, at *4 (N.D. Ill. Nov. 29, 2016). Class Counsel is seeking one-third of the common fund plus $3,571.22 in litigation costs and the Class Representatives' requested service award of $5,000.00 for each. This percentage is consistent with the low end of standard contingency fee awards in the Northern District of Illinois. See *Dobbs v. DePuy Orthopaedics, Inc.*, 885 F.3d 455, 459 (7th Cir. 2018) ("The typical contingent fee is between 33 and 40 percent") citing *Gaskill v. Gordan*, 160 F.3d at 361, 362 (7th Cir. 1998); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (customary contingency fee ranges from 33 1/3% to 40% of the amount recovered); *Prena v. BMO Fin. Corp.,* No. 15 C 09175, 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015) (contingency of 33-40% is typically charged in FLSA cases*); In re Diary Famers of Am., Inc*., 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) (the usual range of contingent fees is between 33 and 50 percent); *McDaniel,* 2011 WL 13257336, at *4 ("[T]he real-word market range for contingent fee cases is 33% to 40%.").

### 4. The Risk of Non-Payment Supports the Requested Attorneys' Fee Award

Counsel's decision to seek the market rate is also reasonable in light of the significant risks of nonpayment that Class Counsel faced if the case did not prevail. At the outset of the litigation, Class Counsel took "on a significant degree of risk of nonpayment" in agreeing to represent Class

Representatives. *Taubenfeld,* 415 F.3d at 600 (approving of district court's reliance on this factor in evaluating attorneys' fees). Class Counsel took this case on a contingency fee basis and assumed the risk that they would receive no fee for their services. *See Sutton,* 504 F.3d at 693-94 (7th Cir. 2007) ("We recognized [in an earlier case] that there is generally some degree of risk that attorneys will receive no fee (or at least not the fee that reflects their efforts) when representing a class because their fee is linked to the success of the suit."). Here, Class Counsel faced risk in establishing that class treatment was appropriate and proving class liability. Defendants would likely have asserted additional defenses, and the litigation would have been protracted and expensive. Additionally, even if Plaintiffs' counsel was able to obtain a judgement, there was a risk that Defendants could not have paid a substantial judgement and would have filed for bankruptcy. Given these risks, Class Counsel "could have lost everything" they invested. *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) (Posner, J.).

Class Counsel's fee request should be approved because it is reasonably based on the market rate. No further showing or analysis is needed. *In re FedEx Ground Package Sys., Inc. Employment Practices Litig.,* 251 F. Supp. 3d at 1243 ("A lodestar cross-check … isn't encouraged in this circuit."); *Wright v. Nationstar Mortgage LLC,* No. 14 C 10457, 2016 WL 4505169, at *17 (N.D. Ill. Aug. 29, 2016) (courts can skip a lodestar check); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 n.27 (N.D. Ill. 2011) ("use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive"). This is because the recovery for Class Members is substantial, Class Members did not have to submit any sort of claim form, and the settlement does not present indicia that it was the product of collusion between the Parties at the expense of Class Members. *See Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629, 636 (7th Cir. 2011) ("consideration of a lodestar check is not an issue of required methodology"); *In re*

18

*Dairy Farmers of Am.,* 80 F. Supp. 3d 838, 850 (N.D. Ill. 2015) ("For attorneys who are arguing for a percentage-of-the-fund fee award, any delineation of hours is seemingly unnecessary . . . ."). Although courts occasionally review counsel's lodestar as "a cross-check to assist in determining the reasonableness of the fee award," *Heekin v. Anthem*, Inc., No. 05 Civ. 1908, 2012 WL 5878032, at *2 (S.D. Ind. Nov. 20, 2012), the lodestar crosscheck is of limited utility because "[u]ltimately . . . the market controls," *In re Trans Union Corp. Privacy Litig*., No. 00 Civ. 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009); *Wright*, 2016 WL 4505169, at *17 ("Nor the is the lodestar an accurate representation of the hypothetical market agreement between the plaintiffs and their attorneys"). As explained above, because Class Counsel's substantial work to date has "bought" a significant recovery for Class Members, the Court need not analyze Class Counsel's lodestar.

The benefit the Settlement provides Class Members is excellent: Members are receiving approximately 98% of their unpaid wages, FLSA liquidated damages, and IMWL/CMWO treble damages, along with the statutory monthly penalty. Class Members are being compensated for alleged wage deductions. Nor will Class or Collective Members be required to provide a general release to participate in the Settlement—the release is limited to wage claims. The absence of a general release exemplifies the results achieved for Collective and Class Members. *See Ramah Navajo Chapter v. Babbitt,* 50 F. Supp. 2d 1091, 1103-04 (D.N.M. 1999) (noting the limited, rather than general, release as further evidence of an exceptional result in favor of class members). Thus, based upon the negotiated fee agreement in this case, the normal rate of compensation in similar cases, the risk Class Counsel undertook in engaging in this litigation, and the excellent result achieved for Class Members, Class Counsel is entitled to reasonable attorney's fees of one third of the fund, $168,333.33 and reimbursement of costs in the amount of $3,571.22.

**B.     The Incentive Award Are Appropriate and Should Be Approved.**

Plaintiffs request $10,000 ($5,000 each) as incentive awards for Named Plaintiffs Inskip and Arandas' participation in this case—they were instrumental to this case, and it is because of their work 185 employees will get substantial payments. They aided Class Counsel in investigating these claims including participating in discovery. In employment-related class actions, incentive awards are particularly appropriate because it is common for prospective employers to do background checks on employees that reveal that they sued a past employer. In fact, if you type their names into Google, one of the first results is a link to an article about this Class and Collective Complaint. While perhaps retaliation is or should be illegal, it's hard to prove and many employers will think twice about hiring a low-wage worker who cost a prior employer over $505,000.00 dollars because they stood up for the rights of hundreds of co-workers.

Courts in the Northern District of Illinois routinely award even larger service payments to named plaintiffs who perform similar actions to recover settlement funds on behalf of similarly situated employees in collective actions. *Furman*, 2017 WL 1730995, at *3 (approving $10,000 service award to named plaintiff in overtime collective action); *Briggs*, 2016 WL 7018566, at *2 (approving $12,500 service awards to named plaintiff in overtime collective action); *Castillo*, 2016 WL 7451626, at *2 (approving $10,000 service awards to named plaintiff in overtime collective action); *Koszyk*, 2016 WL 5109196, at *2 (same).

**C.     The Claims Administrator Fees Should Be Approved.**

The Settlement Agreement provides that the Claims Administrator be paid from the Gross Settlement Fund. Simpluris estimated its fees and costs would be $6,000.00 to administer this settlement. They have not increased this estimate. The Claims Administrator has performed all necessary tasks, including mailing notices, creating a website, checking addresses and skip-tracing,

collecting claim forms, maintaining records, calculating taxes and award distribution, and responding to Plaintiffs' and Defendants' counsels' inquiries. Ex. 1. Moreover, the administration will continue over the course of settlement award payments. The Court should approve $6,000 be paid to the Claims Administrator from the Settlement Fund pursuant to the estimate and Agreement.

## VI. <u>CONCLUSION</u>

The Parties' Settlement Agreement should be approved as it is fair, adequate, reasonable and the attorney fee and cost request, administrator costs and fees and incentive award warrant approval. Therefore, Plaintiffs request that the proposed Final Approval Order (Exhibit 3 which will also be submitted through the Court's proposed order email box) be entered.


Dated: March 21, 2025                                        Respectfully Submitted,

                                                                           By: /s/ John Kunze
                                                                           One of Plaintiff's Attorneys

David Fish
John Kunze
Workplace Law Partners P.C.
155 N. Michigan, Suite 719
Chicago, IL 60601
(312)861-1800
dfish@fishlawfirm.com
kunze@fishlawfirm.com

Counsel for Plaintiffs